**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 11, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

UTAH ENVIRONMENTAL CONGRESS,
a Utah nonprofit corporation,

     Plaintiff-Appellant,

v.

ROBERT A. RUSSELL, as Supervisor of
the Dixie National Forest; DALE
BOSWORTH, as Chief of the Forest
Service; UNITED STATES FOREST
SERVICE,

     Defendants-Appellees.

_____

STATE OF UTAH, by and through its
Division of Forestry, Fire and State Lands,

     Amicus Curiae.

No. 05-4286

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:05-CV-549-DB)**

---

Sarah Tal, Salt Lake City, Utah (Joel Ban, Salt Lake City, Utah, on the opening
brief), for Plaintiff-Appellant.

Mark R. Haag, Attorney, Environment & Natural Resources Division, Department
of Justice, Washington, D.C. (Sue Ellen Wooldridge, Assistant Attorney General,
and Lisa E. Jones, Attorney, Environment & Natural Resources Division,

Department of Justice, Washington, D.C.; and Elise Foster, Office of General Counsel, United States Department of Agriculture, Ogden, Utah, with him on the brief), for Defendants-Appellees.

---

Before **HARTZ**, **SEYMOUR**, and **O'BRIEN**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

In August, 2004, the Forest Service approved the Barney Top Resource Management Project (Project), a timber harvesting and prescribed burning project in Utah's Dixie National Forest, pursuant to the Dixie National Forest Land and Resource Management Plan (Plan). After an unsuccessful administrative appeal to the United States Department of Agriculture, the Utah Environmental Congress (UEC) brought this action in district court alleging that defendants, the United States Forest Service (Forest Service) and its representatives, approved the Project in violation of federal law. The district court entered judgment in favor of the defendants and UEC appeals. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

# I

## BACKGROUND

### A. Statutory Framework

**1. National Environmental Policy Act**

The National Environmental Policy Act (NEPA) mandates that federal agencies, like the Forest Service, assess potential environmental consequences of a proposed action. *Utah Envt'l Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006) (*UEC III*). NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive limits on agency conduct. *Fuel Safe Wash. v. Fed. Energy Regulatory Comm'n*, 389 F.3d 1313, 1323 (10th Cir. 2004). To satisfy NEPA's process requirement, "the Forest Service must prepare one of the following: (1) an environmental impact statement (EIS), (2) an environmental assessment (EA), or (3) a categorical exclusion." *UEC III*, 443 F.3d at 736. If an agency is uncertain whether a proposed action will significantly affect the environment, it may first prepare an EA, a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare" a more detailed EIS. 40 C.F.R. § 1508.9. If, pursuant to that EA, the agency determines that a more detailed EIS is not required, "it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment. *See* §§ 1501.4(e), 1508.13." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757-58 (2004). Notably, an agency need not prepare either an EA or an EIS for actions falling within a "categorical exclusion." 40 C.F.R. § 1508.4. Categorically excluded are "those actions predetermined not to 'individually or cumulatively have a significant effect on the

human environment.' § 1508.4." *See UEC III*, 443 F.3d at 736.

**2. The National Forest Management Act (NFMA)**

The National Forest Management Act of 1976 (NFMA) requires that the Forest Service develop a land and resource management plan, commonly known as a forest plan, for each unit of national forest. *UEC III*, 443 F.3d at 736; 16 U.S.C. § 1604(a), (e), (g)(3)(B). Each forest plan accounts for various interests and uses, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness," and "provides for 'diversity of plant and animal communities based on the suitability and capability of the specific land area.'" *UEC III*, 443 F.3d at 737 (quoting 16 U.S.C. § 1604(g)(3)(B) and (e)(1)). The Forest Service must adhere to the forest plan when "approving or disapproving particular projects, each of which must comply with the applicable forest plan." *Utah Envt'l Cong. v. Troyer*, 479 F.3d 1269, 1272 (10th Cir. 2007) (*UEC IV*) (quoting *UEC III*, 443 F.3d at 737) (quotation marks omitted). Thus, the NFMA requires the Forest Service to develop broad directives for management of a given forest and to consider individual projects within the context of this forest-wide management plan. *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 785 (10th Cir. 2006).

Additionally, "[t]he Secretary of Agriculture has promulgated a number of regulations that set forth the procedures for planning under the NFMA. The first

-4-

set of regulations . . . was implemented in 1982." *Utah Envt'l Cong. v. Richmond,* 483 F.3d 1127, 1131 (10th Cir. 2007) (citation omitted) (*UEC V*). "The 1982 forest planning regulations . . . were superseded in November 2000, when new regulations were promulgated." *Ecology Ctr. Inc. v. U.S. Forest Serv.*, 451 F.3d 1183, 1190 (10th Cir. 2006). However, "[t]he 2000 planning rules were not immediately promulgated. Instead, the new regulations contained transition provisions which provided that, beginning on November 9, 2000, until the promulgation of the new, final rule, the Forest Service should consider 'the best available science in implementing a forest plan.'" *UEC III*, 443 F.3d at 737 (footnote and citation omitted). Accordingly, we have since held that "site-specific project decisions made from November 9, 2000 to January 5, 2005, that implemented pre-November 9, 2000 forest plans, were to be made only under the 'best available science' standard." *UEC V,* 483 F.3d at 1132.

### B. Dixie National Forest Plan

The Barney Top Project is located in the two million acre Dixie National Forest in Southern Utah. The Dixie National Forest Land and Resource Management Plan, adopted in 1986, guides management activities in the Dixie National Forest. The Plan established management objectives for preserving forests of different age classes and for maintaining the goshawk population. The Plan provides a "general direction" to "[p]lan timber harvest on a drainage by

drainage basis."[1] Aplt. App., vol. 1 at 141. Specifically, the Plan states that a "portion of [trees in] each drainage should be in each age class, [s]even to ten percent should be managed as old growth, . . . [and t]he remainder should be more or less evenly distributed in the other age classes."[2] *Id.* The Plan also sets at 40 pairs the "minimum viable population" for the goshawk, a species of hawk considered a "management indicator species" that is dependent on old growth trees for its habitat. Pursuant to the Plan, the goshawk population is to be monitored "annual[ly] if [the goshawk] population is near minimum level, or every 2-5 years in project areas," or whenever a "10% total declining goshawk population size over a 3 year period" presents a "variation which would cause further evaluation and/or change in management direction." *Id.* at 142.

In response to declining goshawk populations, the Forest Service amended the Plan in March of 2000 to include the Utah Northern Goshawk Conservation Strategy (the Conservation Strategy). The Conservation Strategy is a product of the cooperative effort of the Utah National Forests, the Bureau of Land Management, the United States Fish and Wildlife Service, and the Utah Division

---

[1]The parties do not define the term "drainage" in this context, nor did we find a definition in the record. We do not endeavor to craft a proper scientific definition of the term. For our purposes, it is enough to know that the aforementioned drainages are discrete, named land areas within the Dixie National Forest that are home to old growth forests.

[2]The Plan divides the forest into seven "age classes," old growth, mature, poles, shrub-seedling-sapling, grass-forb, shrublands, and grasslands.

of Wildlife Resources to manage goshawk habitat in accordance with the recommendations found in the two leading scientific studies on the subject: "Management Recommendations for the Northern Goshawk in the Southwestern United States" (the Reynolds Report) and "Habitat Assessment and Management Recommendations for the Northern Goshawk in the State of Utah" (the Graham Report). *See* Aple. Supp. App. at 7-10, 48. This amendment to the Plan is sometimes referred to as the Goshawk Amendment.

### C. Barney Top Resource Management Project

The Forest Service designed the Project to suppress the spread of destructive spruce beetles among spruce and fir trees and to improve the distribution of age classes among spruce, fir, and aspens over a four- to six-year period. The Project encompasses a 3,585 acre area of forest land situated on the Barney Top and Table Cliff plateaus and provides for the treatment of 643 acres of Engleman spruce/sub-alpine fir and seventy-three acres of aspen forest. Specifically, the Project calls for 453 acres of conifer thinning, ninety-one acres of pre-commercial thinning, 118 acres of conifer sanitation/salvage harvesting, five acres of meadow restoration, and seventy-three acres of aspen harvesting and prescribed burning. The Forest Service contends the treatment will reduce current tree mortality from spruce beetles in the spruce/fir forest by creating stand conditions that do not promote spruce beetles or disease. The Project's

Environmental Assessment (EA) asserts the treatments will also maintain the presence of aspens by rectifying "an imbalance in aspen age classes" that has facilitated conifer succession.  Aplt. App., vol. 6 at 2374.

The Project includes a number of secondary actions designed to enable completion of its primary objectives.  The EA calls for the reconstruction of 1.70 miles of existing road, the addition of 1.92 miles of presently unclassified road to the classified road system, the closure of 1.87 miles of road to motorized vehicle used by the public, the use of Forest Road 132 as a "haul route," *id*. at 2383, and application of magnesium chloride "as needed for dust abatement for approximately five miles of [Forest Road] 132." *Id.* at 2387.  Additionally, the Project requires "control lines" to prevent the spread of the prescribed burn beyond the targeted acreage. *Id.* at 2389, 2383.

The Forest Service conducted an EA of the project and issued a Finding of No Significant Impact (FONSI).  UEC brought an administrative appeal, which resulted in an affirmance of the Forest Services' decision.  UEC then filed a complaint in the district court contending that the Project violated NEPA, NFMA, and the Forest Plan.  The district court granted summary judgment for the Forest Service.  On appeal, UEC asserts that the Forest Service violated NEPA by failing to properly analyze: (1) the environmental impacts of magnesium chloride (road salt) application to the Project's main road, and (2) the environmental impacts of fireline construction.  UEC also contends that the Forest Service violated NFMA

and the Forest Plan (1) by failing to ensure the requisite quantity of viable old growth forest, and (2) by failing to ensure the viablity of species dependent on old growth, specifically the northern goshawk.  We address each argument in turn.

## II

## STANDARD OF REVIEW

"We take an independent review of the agency's action and are not bound by the district court's factual findings or legal conclusions." *Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1188 (10th Cir. 2006 ) (*UEC II*) (citation and quotation omitted).  As neither the NFMA nor NEPA provide a private right of action, we review the Forest Service's approval of the Project as a final agency action under the Administrative Procedure Act (APA).  *UEC III*, 443 F.3d at 739.  We will not set aside an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 429 (10th Cir. 1996).  Generally, an agency's decision is arbitrary and capricious

> "if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Furthermore, we must determine whether the disputed decision was based on consideration of the relevant factors and whether there has been a clear error of judgment. *Id.* Deference to the agency is especially strong where the

> challenged decisions involve technical or scientific matters within the agency's area of expertise. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

*UEC III*, 443 F.3d at 739. Specifically, when reviewing a FONSI, "we must determine whether the agency acted arbitrarily and capriciously in concluding that the proposed action 'will not have a significant effect on the human environment.'" *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002) (quoting 40 C.F.R. § 1508.13).

# III

# ANALYSIS

## *A. NEPA*

### 1. Road Salt

UEC contends that the Forest Service violated NEPA by failing to analyze the environmental consequences of applying magnesium chloride to Forest Road 30312. As a preliminary matter, we address the Forest Service's argument that this claim is moot. The present litigation notwithstanding, implementation of the Project has begun[3] and, according to David M. Keefe, the Supervisory Forester

---

[3]UEC's present legal challenge has not halted the Project. The Forest Service awarded a contract for completion of the Project and, as of July 2006, the contractor completed gravel crushing and road reconstruction, began timber harvesting and road construction, and applied magnesium chloride to the road. *See* Aple. Supp. App. at 131-132.

for the Dixie National Forest, contractors have already "completed" the application of magnesium chloride to FR 30312. Aple. Supp. App. at 131. Mr. Keefe notes the "Barney Top stewardship contract provides for a one-time application of magnesium chloride that will last for multiple years." *Id.* The Forest Service asserts UEC's claim that the Forest Service violated NEPA by failing to analyze the effect of magnesium chloride is moot because the contractor has already completed its one-time magnesium chloride application.

Pursuant to Article III of the Constitution, federal courts may adjudicate "only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). "[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed" as moot. *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (quotation marks omitted). However, even where it is "too late to . . . provide a fully satisfactory remedy" the availability of "a partial remedy" will prevent the case from being moot. *Id.* at 13. *See also Airport Neighbors Alliance, Inc.*, 90 F.3d at 428-29 ("[C]ourts still consider NEPA claims . . . when the court can provide some remedy if it determines that an agency failed to comply with NEPA."). We must, therefore, ask whether we can effectuate even a partial remedy in this case where the contractor has already applied magnesium chloride to the road.

Included among the "project design criteria" outlined in the EA is the

-11-

statement that "[m]agnesium chloride will be applied as needed for dust abatement for approximately 5 miles of FR 132 adjacent to Pine Lake Campground." Aplt. App. at 2387. The EA thus does not limit the use of road salt to a single application, but instead provides for its use "as needed." *Id.* The Project was intended to unfold over a four- to six-year period, including an initial three year timber harvest. Joseph Black, a Forest Engineer for the Dixie National Forest, noted in a supplemental affidavit that "[g]enerally, magnesium chloride for dust abatement is applied to a road surface once a year." Aple. Supp. App. at 91. Although the Forest Service's present contract calls for only a single application, the EA provides for the use of road salt throughout the life of the Project if necessary. Because the Forest Service retains the flexibility to implement the project design and employ magnesium chloride for dust abatement, this issue is not moot.

Moving to the merits of the claim, the Forest Service acknowledges it did not perform a "detailed analysis in the [EA] separate from the analysis of the effects of the proposed action as a whole" for the application of magnesium chloride. Aple. Br. at 24. It asserts that such an analysis was unwarranted "because [applying magnesium chloride] is a routine component of road maintenance, and road maintenance is exempt from NEPA documentation under categorical exclusion 31.12(4)" of the Forest Service Handbook. *Id. See* FOREST SERVICE HANDBOOK 1909.15 (Environmental Policy and Procedures Handbook),

Ch. 30, § 31.12(4) (hereinafter the Handbook).

The Handbook enumerates several categories of routine maintenance that "may be categorically excluded from documentation in an . . . EA," including the "[r]epair and maintenance of roads, trails, and landline boundaries." *Id.* Within this category, the Handbook provides a non-comprehensive list of examples of such repair, including resurfacing and cleaning culverts, pruning vegetation, grooming a trail, surveying, and "[g]rading a road and clearing the roadside without the use of herbicides." *Id.* Notably, none of these illustrative actions include the application of chemicals to roads or surrounding areas. Furthermore, the Handbook explicitly excludes road grading from this categorical exclusion if it is paired with the application of herbicides.

As documentation provided by the Forest Service states, seven and one-half to nine tons of magnesium chloride are generally added to each road mile for dust abatement. Aple. Supp. App. at 124. In this case, therefore, as much as 45 tons of magnesium chloride will be spread over the five mile expanse of Forest Service road at each application. This amount of added chemical is simply not equivalent to the minor physical alterations involved in cleaning, pruning, surveying, or grooming. The Handbook's omission of any maintenance requiring the application of chemicals and its explicit exclusion of maintenance reliant upon herbicides, suggests that actions involving the addition of chemicals were not among the types of maintenance categorically excluded from consideration in an

-13-

EA.  We conclude, therefore, that the addition of magnesium chloride is not

categorically excluded from consideration in the EA.[4]

Because the application of magnesium chloride is not categorically

excluded from Forest Service review, we consider whether the agency examined

the environmental impact of magnesium chloride applications when evaluating the

Project.  In July 2004, the same "interdisciplinary team . . . assigned to the

Barney Top [EA]," used the "public comments concerning travel management

collected through this proposal," to develop a Roads Analysis Report (RAP)

"analyz[ing] all of the roads within the project area."  Aplt. App., vol. 2 at 788,

790; vol. 5 at 2371.  The RAP posed the following question: "How and where

does the road system create potential for pollutants such as chemical spills, oils,

*de-icing salts*,[5] or herbicides, to enter surface water?"  *Id.*, vol. 2 at 803

---

[4]Courts have previously held such categorical exclusions cannot be summoned as *post-hoc* justifications for an agency's decision.  *See Wilderness Watch v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004) (requiring "[d]ocumentation of reliance on a categorical exclusion . . . to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did."). Here, we find nothing in the record indicating this exclusion was part of the Forest Service's calculus at the time it wrote the EA.  Thus, even if the routine maintenance exclusions were read to include the application of magnesium chloride, the exclusion would not exempt the Forest Service's consideration of its environmental effects from review.

[5]Magnesium chloride is used as both a deicer and a dust pallative.  The compound is applied at greater concentrations when used to deice roads than when applied to control dust.  *See* Aple. Supp. App. at 124.  The document says the Forest Service considered the environmental impact of deicers, a category which includes magnesium chloride, and references as potentially affected the

(continued...)

(emphasis added). It concluded that on "low volume, low maintenance, forest roads such as those found in the Barney Top area, the potential for this is very low (Gucinski and others). The only areas where this potential exists are [a section of Forest Road 30132]."[6] *Id.* The EA, completed two months later by the same officials, proposed for the Project the road developments described and analyzed in the RAP. *Id.* at 2371. In writing the EA, the team directly referenced the conclusions of its RAP. *Id.* at 2371. The RAP's conclusion, supported with a citation to a published text, that there was only a "very low" potential of pollution from de-icing salts at FR 132, the RAP's reference in the EA, and the more general discussion of road impacts in the EA, satisfies us that the Forest service sufficiently examined the effects of road salt application and did not act arbitrarily or capriciously.

## 2. Fireline

UEC also asserts the Forest Service violated NEPA by failing to consider the environmental impact of proposed firelines. According to the EA, after a

---

[5](...continued)
only road subject to application of magnesium chloride as a dust pallative. We are therefore untroubled by the reference to deicers and not the chemically identical, but less concentrated, dust pallative.

[6]"Gucinksi and others" refers to "Gucinski, Hermann, [et al.] 2001. FOREST ROADS: A SYNTHESIS OF SCIENTIFIC INFORMATION. Gen. Tech. Rept. . . . USDA Forest Service, Pacific Northwest Research Station, Portland, OR." Aplt. App., vol. 2 at 824.

harvest of seventy-three acres of aspen, a prescribed fire would be ignited "to reduce activity fuels and re-introduce fire disturbance while stimulating aspen suckering." Aplt. App., vol. 6 at 2543. Following discussion of the scope and purpose of the burn, the EA states "[c]ontrol line preparation would utilize existing mechanical fuel breaks from logging." *Id.* In its discussion of the same prescribed burn, the EA also states:

> "Approximately 110 chains (1 chain = 66') [or 7, 260 feet] of fireline would need to be constructed. Each unit, which is to be burned, will require a mechanical fireline to be constructed. The fireline would be approximately 72-96 inches wide, exposing bare mineral soil. After completion of the prescribed fire treatments, the fireline would be rehabilitated as necessary. These *firelines* would be installed around the perimeter of each small unit."

*Id.* at 2544-45.

Before wading into the merits of UEC's claim, we first address the parties' dispute over the extent to which fireline construction will overlap with existing forest breaks. The Forest Service contends the firelines that "would need to be constructed," *id.* at 2544, are in fact the same "control lines" that "would utilize existing logging fuel breaks," *id.* at 2543. *See* Aple. Br. at 28. According to the Forest Service, "no additional fire lines will be created," because "the roads and skid trails used for the timber harvest will subsequently serve as the fire lines." *Id.* UEC argues, to the contrary, that pre-existing fuel breaks will be augmented by the additional 7,260 feet of perimeter fireline that will "need to be constructed." As we have noted, the EA states the "[f]ire control lines [will] be

constructed around the perimeter, using mechanical equipment," Aplt. App., vol. 6 at 2383, to scrape the surface and "expos[e] bare mineral soil." *Id.* at 2544. The reuse of existing cleared trails is arguably inconsistent with this direction to construct firelines and scrape soil using mechanical equipment.

Even interpreting the EA to mandate the construction of firelines, however, we are persuaded the Forest Service adequately considered the environmental impacts of the prescribed burn. The EA discusses the effects of the prescribed burn on soil and water quality in accordance with "burn plans," *see id.* at 2516 ("These [erosion] effects [resulting from prescribed burning] would be minimized by conducting burning in accordance with burn plans."), and with prior forest service monitoring results,[7] *see id.* at 2524 ("Watershed monitoring on the Dixie National Forest indicates that prescribed burning, when done within burn parameters, has no short term adverse effects to hydrologic function, and short term soil loss is minimal." (citing two Forest Service reports)). Furthermore, the EA states that fire control lines adjacent to Forest Road 132 "will be rehabilitated upon completion of the prescribed fire." *Id.* at 2387. *See also id.* at 2545 ("[T]he fireline would be rehabilitated as necessary."). Although the EA lacks an

[7]The EA referenced these Forest Service documents during its analysis of an alternative to the proposed project. Nevertheless, this is a relevant consideration because the alternative proposal, in advocating a prescribed burn of the same 73 acres, considered the use of firelines using identical language. *See* Aplt. App., vol. 6 at 2389 ("Fire control line would be constructed around the perimeter, using mechanical equipment.").

individualized analysis of the environmental impact of fireline construction, it is clear that the Forest Service broadly considered the effects of prescribed burning on soil and water resources. As such, we conclude the Forest Service did not fail to consider the environmental impacts of the prescribed burn and the effects of the fireline construction in reaching its conclusion that the Project would not cause a significant environmental impact.

## B. NFMA and the Forest Plan

### 1. Old Growth Forest

UEC maintains the Forest Service failed to adhere to its selected methodology for evaluating the presence of old growth forest and thus failed to satisfy old growth requirements set out in the Forest Plan. As the EA notes, the Project's proposed tree harvest is expected to "reduce old growth." Aplt. App., vol. 6 at 2471. The Forest Plan provides that "[s]even to ten percent [of each drainage] should be managed as old growth." Aplt. App., vol. 1 at 141. The Forest Service sought to catalog existing old growth areas to establish a baseline for examining the effects of the proposed action. To this end, the Forest Service selected the "Hamilton" methodology[8] for identifying old growth forest.

_____

[8]The "Hamilton" methodology refers to the manner of identifying old growth provided by Ronald G. Hamilton, a Regional Geneticist for the Forest Service, in "CHARACTERISTICS OF OLD-GROWTH FORESTS IN THE INTERMOUNTAIN REGION." *See* Aplt. App., vol. 6 at 2591.

Hamilton establishes empirical standards for classifying forests as old-growth, including tree diameter, age and density, number of canopy layers, and presence and characteristics of dead and decadent trees. *See* Aple. Supp. App., tab 3.

In this case, each drainage was "delineated into stands and evaluated as to old growth qualification." Aplt. App., vol. 6 at 2470. The administrative record includes a table listing individual stands in the drainages and identifies each as either old growth or non-old growth forest. *See* Aplt. App., vol. 3 at 1076-1121. More specifically, the table includes a single column relating to old-growth classification marked with either a "Y" for yes, old growth, or left blank to indicate the absence of old growth. *Id.* Additionally, a separate table providing greater statistical detail characterizes the trees within the Project area. This multi-column spreadsheet presents data for each individual Hamilton evaluation criterion for all stands in the Project area. *See* Aplt. App., vol. 4 at 1278-80.

In its complaint in the district court, UEC asserted only that the Forest Service violated the Forest Plan because it "failed to determine whether the requisite amount of old growth exists by drainage." Aplt. App., vol. 1 at 37. *See also* Mem. in Supp. of Mot. for UEC's Olenhouse Mot. at 22 ("[T]he Forest [Service] has failed to determine whether sufficient old growth exists by drainage[, and b]ecause the Forest Plan demands that old growth be determined by drainage it has violated its Forest Plan and the NFMA."). Both the administrative record and the EA contradict this claim. As noted above, the

record includes a table identifying the old growth character of each stand, *see* Aplt. App., vol. 3 at 1076-1121, and the EA presented a chart entitled "Old Growth by Drainage," detailing the acreage of old growth present in each drainage. Aplt. App., vol. 6 at 2471. Thus, the record indisputably demonstrates the Forest Service determined the amount of old growth by drainage as required by the Forest Plan.

On appeal, UEC alleges two flaws in the Forest Service's old growth conclusions. First, UEC argues the record fails to present the underlying data for each individual Hamilton element that would have enabled the Forest Service to reach a reasoned final old growth conclusion as to stands in the broader area. Aplt. Br. at 30-31. Second, UEC asserts that even where the underlying data was provided for the Project area, several of the stands were classified as old growth notwithstanding the fact that they did not meet all of the minimum criteria. *Id.* at 32. In both regards, UEC contends the Forest Service has therefore failed to reach a reasoned, non-arbitrary conclusion as to the presence of old growth forest in the drainage area.

UEC's argument on appeal differs markedly from the old growth claim it presented to the district court. There, UEC asserted the Forest Service failed to determine old growth by drainage. By contrast, it now acknowledges that old growth was identified by drainage, but asserts these old growth classifications were not supported by adequate data. Reply Br. at 12. Generally, we do not

consider issues "not presented to, considered and decided by the trial court," *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) (brackets omitted) (quoting *Cavic v. Pioneer Astro Indus.*, 825 F.2d 1421, 1425 (10th Cir, 1987)), because an appellant's "new argument gives rise to a host of new issues, and [Appellee] had no opportunity to present evidence it may have thought relevant to these issues." *Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc.*, 100 F.3d 792, 799 (10th Cir. 1996), *modified on other grounds*, 103 F.3d 80 (10th Cir. 1996). In this case, if UEC had raised its present assertion in the district court, the Forest Service would have had the opportunity to respond by producing additional data or explaining its data gathering procedures in greater detail. *See Lyons*, 994 F.2d at 720 ("We have no idea what evidence, if any, the opposing party would, or could offer . . . , but this is only because it has had no opportunity to proffer such evidence.") (brackets omitted) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). Because UEC did not raise the claim below, we do not consider its present contentions that the Forest Service's calculations of old growth acreage by drainage were arbitrary.

**2. Goshawk**

Lastly, UEC asserts the Forest Service failed to ensure the viability of the goshawk, an old growth dependent species. UEC begins this argument by contending that the Forest Service failed to use the best available science standard

in determining the effects of the Project on the goshawk and its habitat. Alternatively, UEC asserts that even if the best available science standard was employed, the Forest Service failed to comply with the substantive requirements of the science.

Both parties agree that the Forest Service was required to operate under the best available science standard when dealing with management indicator species, as we held in *UEC V,* 483 F.3d at 1132. The Dixie Forest Plan was adopted in 1986 and, as we noted above, it was in March 2000 that the Goshawk Amendment was added to it to include the Conservation Strategy. The Decision Notice for the Barney Top Project was issued in August 2004.

UEC contends this case is governed by *Ecology Center.*, 451 F.3d at 1192, where this court determined that the Forest Service's decision to implement a challenged project was arbitrary and capricious because the Service did not consider or mention the best available science standard during the administrative process. The record here, however, is markedly different. In contrast to the record in *Ecology Center*, the record in the present case makes clear that the Forest Service not only recognized the Conservation Strategy as the best available science governing the preservation of the goshawk, but that it was also guided by this standard throughout the administrative process.

In amending the Utah forest plans to incorporate the Conservation Strategy, the Forest Service expressly found that the Conservation Strategy was based on

-22-

"the best available scientific information specific to forested habitats in Utah." *See* Aple. Supp. App. at 14. The Service further noted that the recommendations in the Reynolds and Graham Reports regarding the goshawk, and embodied in the Conservation Strategy, are "most appropriate" for the situation in Utah. *See id.* at 9-10. Finally, the signatory agencies — the Forest Service, Bureau of Land Management, United States Fish and Wildlife Service, and Utah Division of Wildlife Resources — all agreed that the Conservation Strategy "represents the best available scientific information on the northern goshawk and its use of the habitat in the State of Utah." Aple. Add. at 8-9.

In the years following the adoption of the Conservation Strategy, the Forest Service has reaffirmed its view that the Strategy is based on the best available science. For example, in 2004, in the "LIFE HISTORY AND ANALYSIS OF ENDANGERED, THREATENED, CANDIDATE, SENSITIVE, AND MANAGEMENT INDICATOR SPECIES OF THE DIXIE NATIONAL FOREST" the Forest Service noted again that the Conservation Strategy is "the best science available on goshawk management in Utah." Aplt. App., vol. 5 at 2044. *See also id.* at 2095 (referring to the Conservation as the best science available on goshawk management in Utah). Even this court has noted "the unchallenged status of the Reynolds Report as the best available science." *Ecology Ctr.*, 451 F.3d at 1188.

Having acknowledged that the Conservation Strategy was the best available science, the Forest Service considered it throughout its decision on the Barney

-23-

Top Project.  For example, in the EA for the Project, the Conservation Strategy,

or the reports encompassed therein, are mentioned numerous times.  *See* Aplt.

App., vol. 6 at p. 2387, 2388, 2404-05, 2466, 2467-68, 2482, 2483, 2534, 2535,

2591, 2593.

Unlike the record in *Ecology Center*, this record makes it abundantly clear

that the Forest Service was considering the best available science when it

evaluated how the Project would affect the goshawk and its habitat.  Although the

Forest Service did not specifically *cite* the 2000 regulation requiring application

of the best available science standard in its Decision Notice, the administrative

record establishes that the agency *considered* the best available science through

its attention to the Conservation Strategy, which was added by the Goshawk

Amendment to the Dixie National Forest Plan before the 2000 regulations became

effective.  The Decision Notice explicitly references the Goshawk Amendment,

which itself bound the Forest Service to consider the best available science by its

incorporation of the Conservation Strategy.  We thus have no cause to remand for

consideration of the Project under the appropriate standard as we did in *Ecology*

*C*enter[9]

---

[9]Likewise, this case is distinguishable from *UEC IV* and *V*.  In *UEC IV*, 479
F.3d at 1282, this court determined the Forest Service exclusively applied
NFMA's 1982 regulatory scheme that did not include the best available science
requirement.  *See also id*. at  n. 5 (noting the Forest Service conceded it did not
apply the best available science standard in its project decision).  In *UEC V*, there
was also no evidence that the Forest Service utilized the best available science

(continued...)

Finally, we assess whether the Forest Service complied with the substantive requirements of the best available science standard.  First, UEC asserts the Project "is in direct conflict with the management recommendations and science" advocated in the Reynolds Report for management of the goshawk.  *Id.* at 36.  Second, UEC contends implementation of the Project will significantly reduce the availability of suitable goshawk habitat, thus undermining the Forest Service's FONSI.  Third, UEC argues the Forest Service violated the Forest Plan by failing to change management direction in light of a decrease in the goshawk population.  After reviewing the record, we disagree with these contentions.

Addressing UEC's first two concerns, we begin by noting the Dixie National Forest encompasses over 654,000 acres of potentially suitable goshawk habitat, but no goshawks were observed in the Project area during surveys from 2001-2004.  Aplt. App., vol. 6 at 2535.  Moreover, no treatments are planned in the nest and post-fledgling habitat in the Project area.  Thus, the effects of the Project only concern foraging habitats.  *Id.* at 2535.  We reiterate that the purpose of the Project, as is clear from the EA, is to improve goshawk habitat in accordance with the Conservation Strategy.  *See, e.g.*, Aplt. App., vol. 6 at 2387,

[9](...continued)
standard in approving the challenged project.  The court noted the Record of Decision did not mention the phrase "best available science" and that it did not appear from the decision that the Service "considered the quality of the science utilized in approving the project."  *UEC V*, 483 F.3d at 1136.  In both *UEC IV* and *V*, the records thus failed to demonstrate consideration of the best available science standard.  As we have outlined above, however, that is not the case here.

2388, 2404-05, 2466, 2467-68, 2482, 2483, 2534, 2535, 2591, 2593.  The reason the habitat needs improvement is that the spruce beetle infestation which was first discovered in 2000 has since reached epidemic levels.  Significantly, the older the tree, the greater its susceptibility to spruce beetle infestation.  To achieve the levels of old growth trees dictated by the Reynolds Report, the Forest Service must control the spruce beetle infestation, and that requires ridding the Project area of some older growth trees.[10]  The Project's 643 acres of thinning, sanitation, and salvage harvest will result in short-term loss of 78 acres of the 5,400 acres of goshawk foraging habitat in the Project area.  What the Forest Service considers more important, however, is the long-term gain in suitable goshawk habitat.  By improving the potential for old growth and reducing the risk of loss of those trees from beetle infestation, the Project will heighten the possibility of reaching the percentages of old growth trees prescribed in the Reynolds Report.  In fact, the Forest Service determined that failure to undertake the project would have a long-term negative impact on the goshawk due to increased losses of older growth trees caused by the continuing spread of the spruce beetle.  Tellingly, even UEC has

---

[10]The Reynolds Report suggests optimal levels of the foraging areas should include forty percent old growth trees.  Prior to the Project, a smaller portion of the trees in the area were of the recommended size.  However, the Report expressly acknowledges that local conditions may make those recommendations impossible to achieve.  Aple. Supp. App. at 73 ("Across the Southwestern Region there is considerable variation in site-specific growth potential . . . .Therefore, sites have widely varying capabilities to produce the desired forest conditions; on certain sites desired conditions cannot be attained, while on others the conditions can be exceeded.")

acknowledged that the Project will have "significant positive cumulative effects on the goshawk habitat and populations . . . ."  Aplt. App., vol. 7 at 2662.

Given this evidence, we are not persuaded that the Project conflicts with the Reynolds Report.  Rather, as the record demonstrates, the Project actually strives to meet the goals set forth in the Conservation Strategy for the preservation of the goshawk.  *Id.* at 2466 ("The design of the various vegetation treatments is based on moving the area towards desired future condition[s] for aspen and spruce/fir habitat (Reynolds, 1992; Graham and others, 1999; LRMP . . . .)."  Accordingly, the FONSI correctly concluded that there was no significant environmental impact on the suitable goshawk habitat.

Concerning UEC's complaint that the Forest Plan failed to change management direction in light of a decrease in goshawk population, the record does not support UEC's argument.  Initially, we note that the decrease in the overall population of goshawks is due to drought and other environmental factors such as the spruce beetle epidemic, not forest management activities.[11]  Despite being faced with factors beyond its control, the Forest Service has attempted management changes that address the declining goshawk population.  The most

_____

[11]As noted *supra* at p. 6, the Plan sets a minimum viable population of the goshawk at 40 pairs forest wide.  Because recent counts have involved counting "successful nests," not pairs, the current pair count is unclear.  Successful nests represent a lower number than pairs, given that not all pairs breed.  Hence, there are often more pairs in the forest than successful nests. In any event, no party denies that "goshawk populations have been demonstrating a downward trend across the [f]orest."  Aplt. App., vol. 5 at 2096.

obvious change was the Goshawk Amendment to the Plan to include the Conservation Strategy, the best available science for maintaining goshawk populations and habitat. Moreover, the Project itself also represents a change in management direction. With the Project, the Forest Service has proposed measures to improve goshawk habitat for the long term and thereby increase the population of goshawks. UEC's argument ignores these efforts. The Goshawk Amendment and the Project efforts to improve the goshawk habitat by ensuring potential old growth and maintaining current foraging habitat demonstrate the Forest Service's management activities are appropriately addressing concerns regarding the decrease in the goshawk population.[12]

Given the Forest Service's rationale for the Project and its consideration and compliance with the best available science standard in approving the Project, its decision as it pertains to the goshawk and its habitat is not arbitrary and capricious.

For the reasons stated above, we **AFFIRM**.

---

[12]We also note that in 2004, the number of nesting goshawks increased in the region, leading one to conclude that the number of active nests would increase.