MARTÍNEZ, District Judge,
dissenting.
In my view, the only prong of the test for injunctive relief that the district court analyzed in sufficient detail to permit meaningful appellate review was the Appellants’ likelihood of success on the merits. Because I believe that the district court’s analysis of Appellant’s likelihood of success on the merits was flawed, and that the record is insufficient to allow the court to affirm on any other basis, I would remand this case to the district court. Therefore, I respectfully dissent.
I
Appellants contend that the district court erred by concluding that they were not likely to succeed on the merits of their claim. Because it affirms on alternate grounds, the majority does not discuss these arguments, which form the bulk of the issues argued on appeal. As set forth below, I believe that Appellants have shown a likelihood of success on their claims that the failure to conduct an Environmental Assessment or an Environmental Impact Statement for the Gulf Coast *897 Pipeline violated NEPA, and that the Corps’ failure to consider the cumulative impact of granting 2,228 approvals of TransCanada’s NWP 12 applications violated the CWA and the APA.
A
NEPA requires federal agencies to consider the environmental consequences of their actions and to allow public participation in the decision-making process. Utahns for Better Transp. v. U.S. Dep’t of Transp., 305 F.3d 1152, 1162 (10th Cir.2002) (stating that NEPA “require[s] agencies to consider environmentally significant aspects of a proposed action.”). NEPA does not mandate particular substantive results, but rather requires federal agencies to take a “hard look” at the environmental consequences of an action and to disseminate relevant environmental information for public comment so that the general public may be an active participant in the decision-making process. Citizens’ Comm. To Save Our Canyons v. Krueger, 513 F.3d 1169, 1178 (10th Cir.2008); Utah Envtl. Cong. v. Russell, 518 F.3d 817, 821 (10th Cir.2008) (“NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive limits on agency conduct.”). Therefore, NEPA merely guards against “uninformed — rather than unwise — agency action.” Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).
Towards those ends, NEPA requires federal agencies to prepare environmental impact statements (“EIS”) for “major Federal actions significantly affecting the quality of the human environment.” 42 U.S.C. § 4332(2)(C). To comply with NEPA, an agency must first consider whether the proposed action is one that normally requires an EIS, or whether it is categorically excluded. 40 C.F.R. § 1501.4(a). If the agency cannot readily determine whether an action falls into one of these categories, then it must prepare an environmental assessment (“EA”). Id. §§ 1501.4(b), 1508.9.
An EA is a “concise public document” that “provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or finding of no significant impact.” Id. § 1508.9(a). The EA must address the direct, indirect, and cumulative impacts of the proposed action. Id. § 1508.9(b); see also id. §§ 1508.7, 1508.8, 1508.9. If the EA reveals that the project will have a significant effect on the quality of the human environment, then the Corps must prepare a detailed, written EIS. 42 U.S.C § 4332(2)(C). If the agency determines that its proposed action will not have a significant effect on the environment, then it need not prepare an EIS, and may instead issue a Finding of No Significant Impact (“FONSI”). 40 C.F.R. § § 1508.4, 1508.13. A FONSI must be supported by a statement of reasoning and evidence. Id. § 1508.13.
Appellants contend that the Corps violated NEPA by failing to prepare an EA or EIS for the Gulf Coast Pipeline. The Corps first responds by arguing that its NEPA obligations apply only to the adoption of a NWP, and not to the verification of the applicability of a NWP to a particular project. It contends that requiring the full NEPA process at the pre-certification stage defeats the streamlining purpose of the NWP process.
In support of this contention, Appellees rely on Snoqualmie Valley Preservation Alliance v. U.S. Army Corps of Engineers, 683 F.3d 1155 (9th Cir.2012), in which the Ninth Circuit noted that each NWP must undergo a NEPA process when it is promulgated, and that such process “ensures that any activity under that nationwide *898 permit will have ‘minimal adverse environmental effects.’ ” Id. at 1160-61. However, Snoqualmie Valley involved the issuance of three NWPs for a single location. In this case, the Corps approved the use of NWP 12 for 2,227 water crossings. In my view, this significant distinction makes Snoqualmie Valley of little use here. Given the magnitude of this project, there is little doubt that requiring the Corps to undertake a NEPA analysis at the pre-authorization stage would not defeat the streamlining purpose of the NWPs in general.
The Corps also contends that it only controls permitting of the Gulf Coast Pipeline’s water crossings, and that issuance of a NWP at a water crossing is not significant enough to constitute a “major Federal action” and invoke NEPA. It is well-established that not all construction requiring federal approval becomes “federalized” so as to invoke NEPA. See Winnebago Tribe of Neb. v. Ray, 621 F.2d 269, 270 (8th Cir.1980). With this in mind, the Department of the Army has adopted regulations to provide guidance as to when a project falls under NEPA. See 33 C.F.R. Part 325, app. B.
These regulations have particular provisions that apply when the regulated activity is a link in the overall project, such as the pipeline at issue here. Id. § 7(b). This section of the regulations provides that, in determining the scope of a project, the Corps must consider not only the specific activity which requires a Department of the Army permit, but also “any other portion of the project that is within the control or responsibility of the Corps of Engineers (or other Federal agencies).” Id. § 7(b)(3). The regulations provide the following examples:
For example, a 50-mile electrical transmission cable crossing a 1 1/4 mile wide river that is a navigable water of the United States requires a DA permit. Neither the origin and destination of the cable nor its route to and from the navigable water, except as the route applies to the location and configuration of the crossing, are within the control or responsibility of the Corps of Engineers. Those matters would not be included in the scope of analysis which, in this case, would address the impacts of the specific cable crossing.
Conversely, for those activities that require a DA permit for a major portion of a transportation or utility transmission project, so that the Corps permit bears upon the origin and destination as well as the route of the project outside the Corps regulatory boundaries, the scope of analysis should include those portions of the project outside the boundaries of the Corps section 10/404 regulatory jurisdiction. To use the same example, if 30 miles of the 50-mile transmission line crossed wetlands or other “waters of the United States,” the scope of analysis should reflect impacts of the whole 50-mile transmission line.

Id.

The Gulf Coast Pipeline is 485 miles long, and required the Corps to issue 2,227 permits for water crossings. This means that the Gulf Coast Pipeline crosses United States waters almost five times in each mile, or about once every 1150 feet. As such, the Gulf Coast Pipeline is much more comparable to the second example set forth in the cited regulations — which requires consideration of the entire transmission line — than the first.
Applying these regulations, a district court in Texas has held that the Corps was required to consider the impact of the entire 900 mile pipeline, and to prepare an EA or EIS for the project. See Spiller v. Walker, 1998 U.S. Dist. LEXIS 18341 (W.D.Tex.1998). The court considered the *899 cumulative impact of the involvement of all federal agencies and noted that “the federal government controls the entire pipeline process: construction, operation and safety inspection, sales of the petroleum products, and accident cleanup. It is not only arbitrary and capricious to assert this combination of actions is not major Federal action, but it blatantly flies in the face of common sense.” Id. at *52. The Spiller court also held that the Corps’ role in granting a number of permits for construction has “such a crucial impact on the construction of the ... Pipeline at so many points along the pipeline that it can only be described as ‘major Federal action.’ ” Id. at *40-41.
Considering the number of permits issued by the Corps relative to the overall size of the Gulf Coast Pipeline, it is patently ludicrous for Appellees to characterize the Corps’ involvement in the subject project as minimal, or to maintain that the Corps’ permitting involves only a “link” in the Gulf Coast Pipeline. As the Ninth Circuit has held:
Although the Corps’ permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project. Put another way, while it is the development’s impact on jurisdictional waters that determines the scope of the Corps’ permitting authority, it is the impact of the permit on the environment at large that determines the Corps’ NEPA responsibility. The Corps’ responsibility under NEPA to consider the environmental consequences of a permit extends even to environmental effects with no impact on jurisdictional waters at all.
Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113,1122 (9th Cir.2005).
Given the totality of the circumstances in this case, I believe the Corps’ involvement in the Gulf Coast Pipeline was a “major Federal action” that required a comprehensive NEPA analysis for the project. Therefore, in my judgment the Appellants have shown a likelihood of success on the merits with respect to their claim that the failure to prepare an EA or EIS for the Gulf Coast Pipeline was a violation of NEPA.
B
In their as-applied challenge to the approval of the Gulf Coast Pipeline, Appellants argue that the Corps violated the conditions of NWP 12 by failing to adequately consider the cumulative impact of approving the use of the NWP 12 2,227 times for the project.
NWP 12 requires that the Corps’ verification of a project for which a pre-con-struction notice is filed (as there was in this case) must “include an evaluation of the individual crossings to determine whether they individually satisfy the terms and conditions of the NWP(s), as well as cumulative effects caused by all of the crossings authorized by NWP.” The Gulf Coast Pipeline passes through three Corps’ districts — Galveston, Fort Worth, and Tulsa — and pre-construction notifications were filed in each. Each of these districts issued a brief letter authorizing the proposed action. Appellants contend that none of these three verifications takes into consideration (or, indeed, do any of them even reference) the sections of the pipeline in the other two Corps districts. Of even greater import, Appellants argue, is the fact that none of these administrative letters consider the cumulative impacts of the entire project as a whole. As a result, Appellants contend, the Corps violated NWP 12 in this case.
*900 In response, the Corps contends that its verification letters were sufficient because they set forth the applicable legal standard, which includes a cumulative impacts assessment, and states that the Corps made a “determination” that all conditions were satisfied. Aple. Response Br. at 42. The Corps acknowledges that the verification letters are terse, but contends that an agency is not required to recite its findings in any particular form. The Corps also contends that, even if the explanation in the letters is insufficient, any such error is immaterial because the record shows that the cumulative impact of the Gulf Coast Pipeline would be minimal.
“Because the arbitrary and capricious standard focuses on the rationality of an agency’s decision-making process rather than on the rationality of the actual decision, ‘[i]t is well-established that an agency’s action must be upheld, if at all, on the basis articulated by the agency itself.’” Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir.1994) (quoting Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). “Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record.” Colorado Wild v. U.S. Forest Serv., 435 F.3d 1204, 1213 (10th Cir.2006). The record of decision created by the agency must make plain its course of inquiry, its analysis, and its reasoning. Id. “After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles.” Id. If the agency has failed to provide a reasoned explanation for its action, or if limitations in the administrative record make it impossible to conclude the action was the product of reasoned decision-making, the reviewing court cannot simply affirm. Olenhouse, 42 F.3d at 1575.
The letters of approval prepared by each district do not provide a reasoned basis for any cumulative impacts analysis. Despite the Corps’ contention to the contrary, the law is clear that the agency cannot simply state the legal standard and then recite that it made a “determination” that such criteria were satisfied. See Hull v. I.R.S., 656 F.3d 1174, 1177-78 (10th Cir.2011) (agency’s explanation “will not suffice if the agency’s claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping.”); see also Siddiqui v. Holder, 670 F.3d 736, 745 (7th Cir.2012) (“the recitation of governing law does not excuse the AAO from its obligation to apply the law to the facts of each case.”); U.S. Lines Inc. v. Fed. Maritime Comm’n, 584 F.2d 519, 535 (D.C.Cir.1978) (deference to the agency is inappropriate under the arbitrary and capricious standard when the agency “does not set forth convincing reasons for its determination in sufficient detail to allow the validity [of its decision] to be determined.”).
Recognizing the deficiency in the administrative record with regard to the cumulative impacts analysis, the Corps attempts to rely on affidavits presented to the district court stating that the Districts conferred with each other regarding the cumulative impacts. But this manner of tactical litigation maneuvering — of creating a post hoc evidentiary record before the trial court that was clearly missing in the record before the administrative agency — has been soundly rejected by both this court and the Supreme Court. See Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (barring agency from relying on affidavits containing “post hoc rationalizations” for its actions that were created during the litigation process); Lewis v. Babbitt, 998 F.2d 880, 882 (10th Cir.1993) (district court reviewing an agency action “may not rely on litigation *901 affidavits that provide post hoc rationalizations for the agency’s action”).
Rather, “the agency’s action must be reviewed on the basis articulated by the agency and on the evidence and proceedings before the agency at the time it acted.” Am. Min. Congress v. Thomas, 772 F.2d 617, 626 (10th Cir.1985); see also Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 350 (4th Cir.2001) (“[T]he required explanation must be articulated by the agency at the time of its action.”). “The integrity of the administrative process must be judged by what took place in the administrative proceedings as reflected on the administrative record unaided by affidavit proof in the reviewing court.” Garvey v. Freeman, 397 F.2d 600, 610-11 (10th Cir.1968) (citations omitted); see also Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir.1994) (“[T]he grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record.”).
In this case, the Corps failed to sufficiently articulate its reasoning for concluding that the authorization of 2,227 uses of NWP 12 to construct the Gulf Coast Pipeline would cause only minimal cumulative impact. There is no mention in the administrative record of any collaboration between the Districts with regard to the cumulative impact of the entire length of the Gulf Coast Pipeline. There are also no specific findings in support of the Corps’ conclusion that the Gulf Coast Pipeline, as a whole, would have minimal cumulative impact. The failure to consider the cumulative effects of all of the water crossings involved in the Gulf Coast Pipeline violates the terms of NWP 12, and, therefore, the approval of the use of NWP 12 for construction of the Gulf Coast Pipeline violated the law. See 33 C.F.R. § 330.1(c) (“An activity is authorized under an NWP only if that activity and the permittee satisfy all of the NWP’s terms and conditions.”).
Therefore, in my view, the Appellants have shown a likelihood of success on the merits with respect to their contention that the Corps violated the APA and the CWA when it authorized construction of the Gulf Coast Pipeline through approval of the 2,227 issuances of NWP 12.
II
As set forth above, I find that Appellants have shown a likelihood of success on the merits and, therefore, have satisfied their burden with respect to the first prong of the standard for injunctive relief. However, to prevail on their motion for preliminary injunctive relief, Appellants are required to show, not only that they were likely to succeed, but also that they would suffer irreparable injury, that the balance of the harms tipped in their favor, and that an injunction would not be adverse to public interest. Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir.2009). Because I find that the district court did not adequately address any factor other than likelihood of success on the merits, I would remand to the district court for further proceedings. See Downie v. Indep. Drivers Ass’n Pension Plan, 934 F.2d 1168, 1171 (10th Cir.1991) (remanding where “the absence of findings leaves us with no means by which to judge the exercise of the court’s discretion.”).
The district court’s order denying Appellant’s motion for temporary restraining order is sixteen pages long. Of this, more than twelve pages are devoted to whether Appellants were likely to succeed on the merits. After concluding that Appellants had not shown a likelihood of success on the merits, the district court stated: “As a result of the above, the Court finds that Plaintiffs have failed to establish they are *902 entitled to injunctive relief under Rule 65(a). The Court would be remiss, however, if it did not address the equities in this case.” Aplt.App. at 2001 (Dist. Ct. Order, dated Aug. 5, 2012). The district court’s discussion of the remaining three equitable factors is a mere three paragraphs in length, it is bereft of any meaningful legal analysis of the issues presented, and does not contain any factual or legal citations. I believe this remarkably cursory discussion is insufficient to permit meaningful appellate review, particularly under the relevant abuse of discretion standard.
As the majority points out in a lengthy footnote, Rule 52(a) does not require the district court to set out its findings and conclusions in excruciating detail. See Fed.R.Civ.P. 52, Notes of Advisory Committee on 1946 Amendments (“the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.”). On the other hand, this Court has “cautioned that too little detail frustrates meaningful appellate review by requiring the parties and this court to guess at why the district court reached its conclusion.” OCI Wyo., L.P. v. PacifiCorp, 479 F.3d 1199, 1204 (10th Cir.2007). A district court is required to recite “as many of the subsidiary facts as necessary to permit us to determine the steps by which it reached its ultimate conclusion.” Roberts v. Metro. Life Ins. Co., 808 F.2d 1387, 1390 (10th Cir.1987) (citing Snyder v. United States, 674 F.2d 1359, 1363 (10th Cir.1982)) (internal quotations omitted).
The majority holds that the district court’s analysis of the balance of the equities satisfies Rule 52(a) because it “identified the harms it thought salient, attributed weight to them, and concluded that the balance did not favor granting an injunction.” Maj. Op. at 891, n. 3 (quoting OCI Wyo., 479 F.3d at 1204). I believe the majority has overstated the district court’s findings. The district court simply noted the substantial cost to TransCanada if construction of the Gulf Coast Pipeline is delayed, compared to its finding that allowing the Pipeline to proceed would have “minimal impact on the environment.” Aplt.App. at 2002 (Dist. Ct. Order, dated Aug. 5, 2012).
In its brief discussion of the equities, the district court included no discussion of the irreparable nature of environmental injury in general or the fact that, where such injury has been alleged, “the balance of harms will usually favor the issuance of an injunction to protect the environment.” See Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (“Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, ie., irreparable.”); Catron Cnty. Bd. of Comm’rs v. U.S. Fish & Wildlife Serv., 75 F.3d 1429, 1440 (10th Cir.1996) (“An environmental injury usually is of an enduring or permanent nature, seldom remedied by money damages and generally considered irreparable.”).
Moreover, the district court focused on only the permanent loss of waters that would result after construction of the Gulf Coast Pipeline was complete, and failed to address the real and significant harm caused by the actual construction of the pipeline, including the clearing of trees and vegetation, removing topsoil, filling wetlands, building access roads, and clearing an eighty-five foot construction right-of-way for the length of the pipeline.
The district court’s balancing of the harms also completely ignores the fact that TransCanada chose to incur its economic harm by entering into contracts for services before the Gulf Coast Pipeline was *903 approved, even in light of the controversial nature of the Pipeline. See Davis v. Mineta, 302 F.3d 1104, 1116 (10th Cir.2002) (finding that balance of the harms weighed against the state defendants who “ ‘jumped the gun’ on the environmental issues by entering into contractual obligations that anticipated a pro forma result.”); Utahns for Better Transp. v. U.S. Dep’t of Tramp., 2001 WL 1739458 (10th Cir. Nov. 16, 2001) (holding that state was at fault for its harm when it was aware of controversial nature of the project and chose to enter into contractual obligations nonetheless).
For these reasons, I believe the district court’s analysis with respect to the equitable factors other than likelihood of success on the merits is insufficient for us to determine whether the district court properly exercised its discretion in this regard. Notably, the district court was operating under incredibly difficult circumstances in that Appellants’ Motion for Temporary Restraining Order and Preliminary Injunction was filed only weeks before construction on the Gulf Coast Pipeline was set to commence. As a fellow district court judge, I appreciate the attention that the district court gave this case under nearly impossible time constraints. In light of its finding that Appellants had not met their burden with respect to likelihood of success on the merits, there was no need for the district court to analyze the remaining three equitable factors. However, because I would find that Appellants have shown that they are likely to succeed on the merits, it would become necessary on remand for the district court to consider the remaining equitable factors. Moreover, in my view the district court should have the opportunity to undertake this assessment and analysis in the first instance. See Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir.2001) (remanding for consideration of the public interest and balancing of interests because the district court had not discussed them); see also Flexible Lifeline Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 1000 (9th Cir.2011) (“We believe the better course is to remand to allow the district court to make the requisite factual determinations regarding irreparable harm and apply those factual findings to the four-factor framework to determine whether injunctive relief is warranted.”); Lankford v. Sherman, 451 F.3d 496, 513 (8th Cir.2006) (remanding where district court only considered likelihood of success on the merits because “[t]he district court is in the best position to evaluate all of the evidence and weigh the factors to determine whether the injunction should issue.”).
The majority’s discussion on the balancing of harms usurps the district court’s role not only as the fact-finder, but also as the court which should initially be exercising its discretion to determine whether injunctive relief is appropriate. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (vacating the decision of the court of appeals and ordering a remand so that the district court could address the equitable elements of a preliminary injunction); Acumed LLC v. Stryker Corp., 483 F.3d 800, 811 (Fed.Cir.2007) (“If we were to weigh the evidence ourselves to reach a conclusion on injunctive relief, we would effectively be exercising our own discretion as if we were the first-line court of equity. That role belongs exclusively to the district court. Our task is solely to review the district court’s decisions for an abuse of discretion.”); Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1437-38 (7th Cir.1986) (remanding to the district court for consideration of the equitable elements of a preliminary injunction because “the appellate process is not well suited to an appreciation of the subtle shadings of a case” involved in the balancing of equities).
*904 III
Given my conclusion that the district court abused its discretion in finding that Appellants did not meet their burden of showing a likelihood of success on the merits, I would reverse the district court’s denial of the Motion for Temporary Restraining Order and Preliminary Injunction, and remand with instructions that the district court determine in the first instance whether Appellants have met their burden with respect to the remaining three equitable factors.